# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DOROTHY CAIN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-01127-SEB-MJD |
| | ) | |
| CITY OF MUNCIE and | ) | |
| MUNCIE PARKS DEPARTMENT, | ) | |
| Defendants. | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

Defendants, City of Muncie and Muncie Parks Department, by counsel, submit the following brief in support of their Motion for Summary Judgment:

## I.  OVERVIEW OF PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that she was discriminated against based upon her sex in violation of Title VII of the Civil Rights Act of 1964 while employed part-time with the City of Muncie at Prairie Creek Reservoir ("PCR").   (Amended Complaint, ¶¶ 1, 7).   Her claims comprise allegations of sexual harassment and gender discrimination although the face of her Amended Complaint states, "[t]his case is brought by the Plaintiff for sex discrimination, retaliation and age[1] pursuant to Title VII…" (Amd. Compl. ¶ 1).

Plaintiff alleges that she applied for a full-time position at PCR in February, 2012, but that a male (James Upchurch) was hired for the position.   Id. at ¶¶ 8-9.   Upon learning about Upchurch's hire, Plaintiff went to the PCR Superintendent, Ivan Gregory, and confirmed that she had not been hired for the full-time position.  (Exhibit B- Deposition of Dorothy Cain, p. 179:5-21).   Gregory told Plaintiff to talk to Mayor Dennis Tyler, so Plaintiff and her co-worker, Eldon

---

[1] Nowhere in the complaint does Plaintiff mention her age being a causal factor in any alleged adverse job action. Plaintiff has failed to state a claim upon which relief can be granted under the ADEA.

Cook, went to Mayor Tyler's office.  Id. at 179:17-180:4.  Plaintiff alleges that Mayor Tyler told Plaintiff that Upchurch was hired as a political favor.  (Exh. B, pp. 183:23-184:6; 188:6-15, Exh. 6).

Plaintiff alleges that a male co-worker, Kevin Rabenstein, stood in his underwear during work on March 23, 2012, and asked Plaintiff if she wanted to "tuck a buck?"  (Amd. Compl. ¶12).  Plaintiff alleges that on April 17, 2012, Rabenstein gave her a photograph of himself and another employee (Nathan Burgess) with their pants pulled down far enough to show their buttocks.  Id. at ¶ 13.  Finally, Plaintiff alleges that shortly after April 17, 2012, Burgess asked several times if she would like to look at his penis piercing.  Id. at 14.   Plaintiff alleges that she reported this incident to Gregory.  Id.

Plaintiff further alleges that she submitted another application for the full-time position in August 2012.  (Amd. Compl. ¶ 26).  On October 19, 2012, Plaintiff alleges she was laid off by the City.  Id. at ¶ 27.  Plaintiff alleges that the City refused to hire her for the full-time position because she is female.

## II.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.     *Overview of Plaintiff's Employment at Prairie Creek Reservoir*

From 2004 to October 22, 2012, Plaintiff was employed as a part-time laborer assigned to Prairie Creek Reservoir ("PCR"), which is part of the Muncie Parks Department.  She worked seasonally during some years and year-round in other years.  (Exhibit A- Affidavit of Sarah Beach, Exhs. 1-3).  PCR has the following amenities: seasonal campground, boating/fishing, docks, boat launches, beach, concessions, swimming, playground, picnic shelters.  (Exhibit C, ¶ 3).  Plaintiff held a part-time unskilled grounds and maintenance position that involved cleaning

restrooms, mowing, general maintenance, and seasonally inserting and removing piers.[2]  Id. at ¶ 4, Exhibit B- Deposition of Dorothy Cain, p. 57:8-14.  All full-time and part-time groundskeeper/maintenance positions were unskilled laborers.  (Exh. C at ¶ 5).

The City of Muncie had Republican mayors for two decades before Democratic mayor, Dennis Tyler, took office on January 1, 2012.  (Exh. A, ¶ 7).  This administration change resulted in the replacement of many department heads (including the PCR Director), the Police Chief, and Human Resources Director.  (Exh. C, ¶ 9).  As a result of the administration change, long-time City employees who had worked for department heads for years were forced to adapt to their new supervisor's guidelines, instructions, and management style.  (Exh. A, ¶ 10).

B.      New PCR Superintendent and Issues With Plaintiff.

Prior to the mayoral administration change in 2012, there were four full-time employees assigned to PCR and a few part-time employees.  (Exh. A, ¶ 8).  One of Mayor Tyler's goals was to revitalize PCR and devote sufficient resources to accomplish this goal.  (Exh. C, ¶ 6).  Mayor Tyler's plans to turn PCR into a more viable asset required new leadership and more accountability by employees.  Mayor Tyler hired Ivan Gregory on January 1, 2012, to oversee and operate PCR.  Id. at ¶¶ 7-8.  Gregory's management style was different than past PCR Superintendents.  PCR employees, particularly laborers, were allowed to operate more independently before Gregory became Superintendent.  (Exh. B, pp. 79:24-81:6).  In contrast, Gregory required more accountability from the laborers, made the final decisions on the laborers' projects and tasks, and gave daily instructions to the laborers.  (Exh. C, ¶ 8, Exh. D- Deposition of Ivan Gregory, p. 55:10-12).

---

[2] PCR employees often wore waders when inserting and removing piers from the water.  The employees typically changed in and out of the waders in a separate room in the garage or by their lockers in the garage.

Gregory had problems with Plaintiff's attitude from his first day on the job in January 2012. (Exh. D, pp. 54:24-56:8). Plaintiff immediately began to undermine Gregory's authority and question his decisions relative to day-to-day operations. Id. Plaintiff routinely told other PCR employees how they should do their jobs, which is reflected in her disciplinary violations outlined below. Mr. Gregory and others described Plaintiff as an extremely intense person who routinely overreacted, yelled, screamed, cursed, and degraded other employees on the job. Not only was Cain insubordinate to Gregory, but she was extremely rude to co-workers and very difficult to work around. (Exh. A, ¶¶ 23-24; Exh. C, ¶¶ 10-16, Exhs. 1-2, 4-5; Exh. D., pp. 55:17-56:25).

> C.   A Full-Time (Unskilled) Utility Position Becomes Available at PCR and is Filled by James Upchurch.

In February, 2012, a full-time utility person position became available at PCR. (Exh. A, ¶ 11). Under the new administration, all individuals desiring a position were required to submit a written application to Human Resources ("HR"). Id. at ¶ 12. Plaintiff submitted an application for full-time utility person position at PCR on February 28, 2012. (Exh. A, ¶ 13 and Exh. 4).

James Upchurch (white male) also submitted an application for the full-time utility position. (Exh. A, ¶ 14 and Exh. 5). Although the position did not require a CDL, an applicant with a CDL was preferable because the employee could then operate a garbage truck at PCR, thereby increasing operational efficiency by reducing the time it took to collect trash. (Exh. C, ¶ 9). Cain did not possess a CDL. (Exh. A, Exh. 4). Upchurch possessed a CDL Class B Learner Permit at the time that he applied for the full-time position. (Exh. A, Exh. 5).

Upchurch was selected for the full-time position and began working at PCR on March 14, 2012. (Exh. A, ¶ 15 and Exh. 6). On July 11, 2012, Upchurch was transferred to the Street

Department.  Id. at ¶ 18 and Exh. 7.  The City began accepting applications, but did not immediately fill the vacant full-time utility position at PCR.  Id. at ¶ 17.[3]  The job description for this position required the applicant to possess a valid CDL.  Id. at ¶ 19 and Exh. 8.  On October 1, 2012, the City hired Cody McCord to fill the position.  McCord possessed a CDL.  Id. at ¶ 20 and Exhs. 9-10.  There was a different full-time utility position that was filled by Mitchell Upchurch on October 10, 2012.  Cain did not submit an application for this position or any full-time utility  position at PCR after February 28, 2012.  A CDL was not required for the position filled by Mitchell Upchurch, but for the reasons stated above was preferred.  Mitchell Upchurch possessed a CDL.  (Exh. A, ¶¶ 18, 21).

       D.     *Plaintiff's Disciplinary Actions*

On July 5, 2012, two PCR employees complained to Gregory that Plaintiff had yelled and cursed at them and had been disrespectful to other employees.  (Exh. C, Exhs. 2-3).  On July 5, 2012, Gregory gave Plaintiff a written warning prepared via a Disciplinary Action Form that was presented to Plaintiff on July 9, 2012, in a meeting between Plaintiff, Beach, and Gregory.  The Disciplinary Action Form indicated that Plaintiff had a poor work effort, poor attitude and had created a hostile work environment.  (Exh. C, ¶¶ 12-13 and Exh. 3).  Beach told Plaintiff during the meeting on July 9, 2012, that Plaintiff was not allowed to instruct other employees as to how to perform their jobs and that further complaints of abusive language and behavior towards her co-workers could result in termination.  In short, Beach told Plaintiff that Plaintiff needed to focus on doing her job and not tell co-workers what to do or how to do it since she was not a supervisor.  (Exh. A, ¶ 22).

_____

[3] The City disputes that Plaintiff submitted an application for this position and Plaintiff has not produced a copy of an application.  However, as explained below, summary judgment should be entered in Defendants' favor even if Plaintiff applied for this position.

Despite this admonishment, just four days later, on July 13, 2012, Plaintiff's co-worker, Steven Chrisp, complained that she approached him and advised him that he was building walk-boards for a pier incorrectly. She then instructed him on how she felt that the walk boards should be constructed. (Exh. A, ¶¶ 23-24, Exhs. 12-13; Exh. C, ¶¶ 14-15, Exhs. 4-5). Gregory prepared a Disciplinary Action Form to document a second written warning for failure to follow written or verbal directions of management on July 16, 2012. (Exh. C, ¶ 15, Exh. 6). Gregory and Beach met with Plaintiff on August 1, 2012, to discuss the Disciplinary Action Form. (Exh. A, ¶ 24, Exh. 13; Exh. C, ¶ 16). Plaintiff indicated during the meeting and on the Disciplinary Action Form that she "did not tell *that boy* [Chrisp is an African-American male] what to do" and that she simply told him how she would construct the walk-board. (Exh. B, pp. 118:7-119:20, Exh. 3).

E. *Several Part-Time PCR Laborers, Including Plaintiff, Are Terminated During and at the End of the 2012 Season.*

From September to November, 2012, Plaintiff and several other part-time PCR employees either quit or were terminated due to the end of the park season. Some part-time male laborers were discharged for cause. The following chart includes part-time PCR laborers that either quit or were discharged near the end of the 2012:

| Employee | Sex | Date Employment Ended | Reason Noted on PIF |
|---|---|---|---|
| Darryale Hawkins | Male | 9/4/12 | Discharge- Insubordination |
| Curtis Young | Male | 9/20/12 | Discharge- Intentionally Damaged City Equipment |
| Steven Chrisp | Male | 9/21/12 | Voluntary Quit (Failed to appear after Gregory told him that he would be "letting him go" the week of 9/24/12) |
| Frederick Lipscomb | Male | 10/2/12 | Voluntary Quit |
| Jeff Leist | Male | 10/12/12 | Voluntary Quit- Seasonal |

| Dane Watters | Male | 10/15/12 | Voluntary Quit- Didn't come back from lunch |
|---|---|---|---|
| Dorothy Cain | Female | 10/22/12 | Layoff |
| Tabatha Morton | Female | 10/22/12 | Layoff- Seasonal Status |
| Austin Rich | Male | 11/19/12 | Season Over |
| Rockie Jernigan | Male | 11/19/12 | Layoff- Seasonal Part-Time |

(Exh. C, ¶ 19 and Exhs. 7-15).

All of these part-time PCR laborers would have been terminated at the end of the 2012 had some of them not been discharged or voluntarily quit before they were terminated. (Exh. C, ¶ 19). There was another female part-time PCR laborer, Martha Campisi, that was hired on March 12, 2012, and was not terminated at the end of the 2012 season. Id. at ¶ 29, Exh. 16. Campisi voluntarily quit following the 2013 season. Id. Based upon Plaintiff's disciplinary issues and poor attitude, Gregory made the decision during the 2012 season that he would not re-hire Plaintiff if she applied in 2013.

### F.     Plaintiff Files Several EEOC Charges

On August 30, 2012, Plaintiff filed an EEOC Charge alleging sex and age discrimination as a result of not being awarded the full-time position at PCR. (Exh. B, Exh. 6). Plaintiff had an opportunity to review the charge before she signed it and she signed it under the penalty of perjury. (Exh. B, p. 185:15-188:5). On October 24, 2012, Plaintiff filed her second EEOC Charge alleging that she had been laid off in retaliation for filing a prior charge of discrimination. Id. at Exh. 8. The second charge was prepared based upon the information that Plaintiff communicated to the EEOC. Id. at pp. 233:12-235:10. Plaintiff signed this charge as being true and accurate. Id. at p. 235:11-19. Plaintiff filed a third EEOC Charge on March 15, 2013, after she was not re-hired at PCR in 2013 alleging she was retaliated against for filing the

previous two EEOC charges.  Id. at Exh. 9.  Again, Plaintiff signed this charge as being true and

accurate.  Id. at p. 235:11-19.  None of the EEOC charges reference any allegation of sexual

harassment.

Plaintiff filed her lawsuit on July 15, 2013.  (Doc 1). Then, on April 18, 2014, Plaintiff

filed her fourth EEOC charge related to offensive conduct of a sexual nature allegedly occurring

in March and April 2012, which predated her first EEOC Charge.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to

secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*,

477 U.S. 317, 327 (1986). The party moving for summary judgment has the initial responsibility

of informing the court of the basis for its motion and identifying those portions of the record

which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The

burden then shifts to the non-moving party to prove that there is a genuine issue with regard to

the facts and he must come forward with specific facts showing there is a genuine issue for trial

by referring to the record evidence on file. Fed. R. Civ. Proc. 56(e). Under the standard

enunciated in *Celotex*, summary judgment must be granted if the plaintiff cannot establish an

essential element of his claim. *Beauchamp v. City of Noblesville*, 320 F.3d 733 (7th Cir. 2003),

citing *Celotex*, 477 U.S. at 322. "At the summary judgment stage, facts must be viewed in the

light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."

*Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007) (citing Fed. Rule Civ. Proc. 56(c)).

## IV.  ARGUMENT

Plaintiff alleges that Defendants discriminated against her because of her sex and retaliated against her because she was female.  Plaintiff's complaint repeatedly references Plaintiff being subjected to sexual discrimination, but she fails to clearly articulate whether she is attempting to advance a sexual harassment claim.   While Plaintiff has not explicitly alleged sexual harassment based on quid pro quo or hostile work environment she avers a few instances where she was subjected to inappropriate conduct (i.e. being shown a picture of male buttocks and being asked if she wanted to see a co-worker's pierced penis).   However, none of these claims were raised in any of her three EEOC charges. Therefore, she failed to exhaust administrative remedies relative to those allegations.  Moreover, Cain is unable to make a *prima facie* case of gender discrimination.

### A. Summary Judgment Should Be Entered in Defendants' Favor for Any Sexual Harassment Claim.

> *1.   Any Sexual Harassment Claims Must be Dismissed Because the Claims Were Not Included in Plaintiff's EEOC Charges.*

Prior to filing her initiating complaint on July 15, 2013, Plaintiff filed *three* EEOC charges.   These EEOC charges do not mention any facts supportive of a charge for sexual harassment, hostile work environment, or *any* of the incidents of alleged harassment that Plaintiff included in her complaint and amended complaint.[4]   Accordingly, Plaintiff failed to exhaust her administrative remedies for any alleged sexual harassment claim.

The Seventh Circuit's general rule is that "a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge."  Cheek v. W. & S. Life Ins. Co., 31F.3d 497, 500 (7th Cir. 1994).  This rule serves the dual purpose of giving the employer notice of the

---

[4]  Plaintiff filed her Amended Complaint on 8/14/13(Doc.11). It contains the same factual averments as her initial complaint, but contains additional conclusory allegations relative to how those same facts constituted sexual discrimination.

conduct about which the employee is aggrieved such that the employer may respond to the EEOC and take any needed corrective action.  It also affords the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, and of giving the employer some warning of the conduct about which the employee is aggrieved."  Id. Allowing allegations in the a complaint that are "outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party notice of the charge."  Id.

The test for determining whether an EEOC charge encompasses the claims in a complaint is as follows: "all Title VII claims set forth in a complaint are cognizable that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'"  Id. (*quoting* Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164, 167 (7th Cir.1976) (en banc). This test "is satisfied if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge."  Cheek, 31 F.3d at 500. "The claims are not alike or reasonably related unless there is a factual relationship between them."  Id. at 501.   Thus, "the EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*."  Id.

In Cheek, the plaintiff alleged in her EEOC charge that she had been "constantly intimidated" by a staff manager and that she had been discriminated against because of her sex. Id. at 500.  The plaintiff later filed a complaint alleging, among other things, that she had been subjected to a hostile work environment through sexual harassment inflicted by a person other than the staff manager identified in her EEOC charge.  Id. at 503.  The Seventh Circuit held that a sexual harassment claim could not be reasonably inferred from anything alleged in the

plaintiff's EEOC charge.  Id. at 504.  In holding that the plaintiff had failed to exhaust her administrative remedies as a prerequisite to filing suit, the Seventh Circuit reasoned:

> When an EEOC charge alleges a particular theory of discrimination, allegations of a different type of discrimination in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge. Ordinarily, a claim of sexual harassment cannot be reasonably inferred from allegations in an EEOC charge of sexual discrimination.

Id. at 503.

The Seventh Circuit also noted:

> Because Cheek was not professionally trained as a lawyer, we could not expect her to artfully draft the allegations in her EEOC charge; however, she must at least have described, with some degree of specificity, the conduct she considered discriminatory. She did not. As a result, the charge failed to serve its dual purpose of giving Western–Southern notice of the factual basis for the claims of sex discrimination in Cheek's complaint, and of affording the EEOC an opportunity to investigate the claims.

Id. at 502.

Plaintiff's three pre-suit EEOC charges do not mention sexual harassment, a hostile work environment arising from harassment, or *any* of the incidents of alleged harassment that Plaintiff raises in this lawsuit.  In fact, there is not even a hint of sexual harassment alleged in the pre-suit EEOC charges.  Likewise, the EEOC charges do not mention the names of the employees who allegedly harassed Plaintiff.  It is undisputed that the City was not put on notice that Plaintiff was claiming sexual harassment in the workplace.  After receipt of the pre-suit EEOC charges, City legal and the HR director engaged in time consuming investigations into the charges and provided position statements responsive to those charges. At no time did the EEOC make inquiry into possible claims of sexual harassment and neither the HR director nor PCR superintendant were aware that Plaintiff had concerns about sexual harassment until the instant lawsuit was filed.  (Exh. A, ¶ 25-26; Exh. C, ¶ 31).

Since Plaintiff's EEOC charges do not mention allegations of sexually offensive conduct, a sexual harassment claim cannot be reasonably inferred from anything that Plaintiff alleged in her EEOC charges. Thus, Plaintiff failed to exhaust her administrative remedies and summary judgment should be entered in Defendants' favor on any and all claims of sexual harassment.

2. *The Conduct Alleged By Plaintiff Is Not Severe or Pervasive and Does Not Arise to a Hostile Work Environment.*

Even if Plaintiff had exhausted her remedies by filing EEOC charges that encompassed sexual harassment allegations, to establish a prima facie case of sexual harassment under Title VII, Plaintiff must prove: "(1) she was subjected to unwelcome sexual harassment; (2) the harassment was based on her sex; (3) the sexual harassment unreasonably interfered with her work performance by creating an intimidating, hostile or offensive work environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability." Benders v. Bellows and Bellows, 515 F.3d 757, 768 (7th Cir. 2008). With regard to the third element, "[a] hostile work environment is created when the conduct at issue is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Patton v. Keystone RV Co., 455 F.3d 812, 815-16 (7th Cir. 2006) (internal quotations omitted). A determination of whether conduct is severe or pervasive is made by looking to "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." Overly v. KeyBank Nat. Ass'n, 662 F.3d 856, 862 (7th Cir. 2011). Here, the conduct alleged by Plaintiff, although likely offensive to some is not sufficiently severe or pervasive to be actionable sexual harassment.

"Not all offensive conduct violates federal law; Title VII is not a civility code." Patton, 455 F.3d at 815. Nor is Title VII "designed to purge the workplace of vulgarity." Id. Title VII is

not a workplace civility code but is designed to protect women from conditions that can make the workplace hellish for them. "Not every unpleasant workplace is a hostile environment. The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is the one that is hellish." <u>Perry v. Harris Chernin Inc.</u>, 126 F.3d 1010, 1013 (7th Cir.1997) (quoting <u>Baskerville v. Culligan Int'l Co.</u>, 50 F.3d 428, 430 (7th Cir.1994)). Accordingly, summary judgment is frequently awarded to defendants where the harassing incidents complained of, while vulgar and boorish, are not extreme enough to alter the terms and conditions of employment.

In <u>Baskerville</u>, the plaintiff complained that her supervisor did the following over a period of seven months:

1. He would call her "pretty girl," as in "There's always a pretty girl giving me something to sign off on."
2. Once, when she was wearing a leather skirt, he made a grunting sound that sounded like "um um um" as she turned to leave his office.
3. Once when she commented on how hot his office was, he raised his eyebrows and said, "Not until you stepped your foot in here."
4. Once when the announcement "May I have your attention, please?" was broadcast over the public-address system, Hall stopped at Baskerville's desk and said, "You know what that means, don't you? All pretty girls run around naked."
5. He once called Baskerville a "tilly," explaining that he uses the term for all women.
6. He once told her that his wife had told him he had "better clean up my act" and "better think of you as Ms. Anita Hill."
7. When asked by Baskerville why he had left the office Christmas Party early, Hall replied that there were so many pretty girls there that he "didn't want to lose control, so I thought I'd better leave."
8. Once when she complained that his office was "smokey" from cigarette smoke, Hall replied, "Oh really? Were we dancing, like in a nightclub?"
9. When she asked him whether he had gotten his wife a Valentine's Day card, he responded that he had not but he should because it was lonely in his hotel room (his wife had not yet moved to Chicago)

> and all he had for company was his pillow. Then Hall looked
> ostentatiously at his hand. The gesture was intended to suggest
> masturbation.

50 F.3d at 430.  The Seventh Circuit overturned a jury verdict finding that no reasonable jury could find that such remarks created a hostile working environment.  Id. at 431.

The Court noted that "the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing" is not a bright line. Id. (*citing* Carr v. Allison Gas Turbine Div., Gen. Motors Corp., 32 F.3d 1007, 1010 (7th Cir. 1994)).  On one side of that line, the Court noted, "lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures." Id. at 430.  On the other, "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." Id.  In reviewing the verdict of the district court, with this continuum in mind, the Court reasoned that if the facts presented by plaintiff fell somewhere in the middle, it could not set aside the trial verdict.  Id. at 431. However, the Court held that plaintiff's facts fell solidly on the "merely vulgar and mildly offensive" side of the line and stated that the plaintiff's supervisor "whatever his qualities as a sales manager, is not a man of refinement; but neither is he a sexual harasser." Id.

In coming to this decision, the Court reasoned that despite the supervisor's "unrefined" behavior:

> He never touched the plaintiff. He did not invite her, explicitly or by implication,
> to have sex with him, or to go out on a date with him. He made no threats. He did
> not expose himself, or show her dirty pictures.

Id.  The Court concluded that "a handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." Id.

Courts have used <u>Baskerville</u> as a "yardstick" for determining what conduct amounts to actionable sexual harassment. *See* <u>Gleason v. Mesirow Fin., Inc.</u>, 118 F.3d 1134, 1144 (7th Cir. 1997). In <u>Gleason</u>, the plaintiff alleged that she had been exposed to multiple incidents of second-hand sexual harassment, and had been told by her boss that he knew she was pregnant because her breasts looked bigger, and that he spent the weekend at a nudist camp after he placed an advertisement for a nudist colony on the plaintiff's desk, and that he wanted to hold plaintiff's hand. <u>Id.</u> at 1136, 1140. The Seventh Circuit affirmed the district court's grant of summary judgment for Defendant finding that the plaintiff's allegations of sexual harassment were less egregious than those in <u>Baskerville</u>. <u>Id.</u> at 1146.

In <u>Rogers v. City of Chicago</u>, 320 F.3d 748 (7th Cir. 2003) *overruled on other grounds by* <u>Hill v. Tangherlini</u>, 724 F.3d 965 (7th Cir. 2013) the plaintiff, a female police officer in Chicago, filed a two-count complaint against the city alleging sexual harassment and retaliation. <u>Id.</u> at 749-50. The plaintiff pointed to four incidents of a sexual nature involving another officer, Kelenyi, that she claimed supported her hostile work environment claim:

1. a comment by Kelenyi to Rogers that he would "like to be that FOP [Fraternal Order of Police book] in [her] back pocket;"
2. when Rogers appeared to be slipping on the stairs, Kelenyi said "don't fall," caught hold of Rogers, and then asked Rogers whether she had a boyfriend or needed one;
3. a comment by Kelenyi to Rogers and Mark Kelly, one of Rogers's partners, during an evening check off, when they were turning in their daily reports of activity (that showed high activity), that "[y]ou guys are the real police. What are you trying to do, get on the TAC team?;"
4. Kelenyi's interference with Rogers and Kelly's response to a domestic violence call;
5. Kelenyi's threatening remarks to Rogers and Kelly that he had a problem with the two of them;
6. Kelenyi's remark to Rogers, while exiting a locker room, that "Your breasts look nice in that … red turtleneck";
7. Kelenyi's frequent appearance on jobs and calls of Rogers even when he was not her assigned Sergeant;

8. Kelenyi's refusal to process, or to turn back, reports prepared by Rogers and Kelly;
9. Kelenyi's ordering Rogers to put a document in a box at the end of the room, stating, "Put this in the bin so I can watch you walk over and put it in"; and
10. Kelenyi's interference with the work of Rogers and another one of her partners in a robbery case.

Id. at 750.  The district court entered summary judgment on the plaintiff's sexual harassment claim, finding that Kelenyi's conduct 'did not rise to the level of harassment.'  Id. at 752.  The Seventh Circuit, relying on Baskerville,  Id. at 752-53.  The Court noted that the facts in Rogers were less severe than Baskerville.  Id. at 753.

Plaintiff points to *three* alleged instances to support a claim of a hostile work environment:  (1) on March 23, 2012, Rabenstein stood in his underwear during work on March 23, 2012, and asked Plaintiff if she wanted to "tuck a buck?;" (2) on April 17, 2012, Rabenstein gave Plaintiff a photograph of himself and Burgess mooning a trail camera with their buttocks exposed to varying degrees; (3) shortly after April 17, 2012, Burgess asked several times if Plaintiff would like to look at his penis piercing. (Amd. Compl. ¶¶12-14).  While inappropriate, these incidents do not create the kind of work environment that Title VII prohibits.  At best, this type of behavior, assuming it is true is merely offensive and does not rise to the requisite level of actionable conduct under Title VII.

The allegations in this case are in the nature of crude or boorish behavior, offhand comments, isolated incidents, and teasing which do not rise to the level of conduct that alters the terms and conditions of employment. *See e.g.* Scruggs v. Garst Seed Co., 587 F.3d 832, 840-41 (7th Cir. 2009)(supervisor's occasional gender-based inappropriate comments were not sufficiently severe or pervasive to rise to level of a hostile work environment where comments included that employee was "made for the back seat of a car," looked like a "dyke," supervisor

was not physically threatening, and did not make comments suggesting he was interested in employee sexually.)  Like the plaintiff in <u>Baskerville</u>, Plaintiff does not claim that Burgess or Rabenstein made physical contact with her or attempted to do so.  At no time did of the alleged offenders express an interest in her sexually or ask her to perform sexual favors.  Rabenstein and Burgess did not threaten Plaintiff.  Further, unlike the comments in <u>Baskerville</u>, <u>Gleason</u>, and <u>Rogers</u>, which concerned the plaintiffs' physical appearances and/or sexual activity, none of the comments alleged by Plaintiff concern her physical appearance or sexual activity.  Finally, the instances alleged by Plaintiff were infrequent.   When viewing the evidence in a light most favorable to Plaintiff, she was subjected to a few off-hand comments and a picture of two co-workers "mooning" a camera, which amounts to "occasional vulgar banter, tinged with sexual innuendo, of course or boorish workers."   Moreover, she saw one worker in his underwear – either before or after he put on his waders.   While none of this conduct should occur in the workplace, it is not actionable sexual harassment under Title VII and summary judgment should be entered for Defendants.

**B.  Plaintiff Cannot Make a Prima Facie Case of Gender Discrimination.**

Plaintiff alleges that Defendants "refused to hire her because she was a female" and she references being subjected to sexual discrimination, but does not identify factual allegations upon which this proposition is advanced.   Nonetheless, Plaintiff alleges instances in which she was not chosen for a full-time position or was laid off from her part-time position and, based on Plaintiff's discovery responses, Plaintiff contends that she was discriminated against because of her sex when (1) she was not hired to a full time groundskeeper position in March 2012, (2) she was not hired to a full time groundskeeper position in August 2012, and (3) she was "terminated"

in October 2012. (Exhibit F- Plaintiff's Answers to Interrogatories, No. 15; Amd. Complaint, ¶¶ 8-9, 26-28).[5]

Although the Seventh Circuit is considering moving away from the "direct" and "indirect" methods of proof, the Court continues to use the direct/indirect approach to determine whether the plaintiff can create a genuine issue of material fact. Chaib v. Indiana, 2014 WL 685274, *4 (7th Cir. 2014). To proceed under the direct method to prove she was discriminated against when not hired for the full-time position in 2012, Plaintiff "must offer either direct evidence that acknowledges discriminatory animus on the part of the employer or circumstantial evidence which establishes discriminatory motive through a longer chain of inferences." Grigsby v. LaHood, 628 F.3d 354, 358 (7th Cir. 2010), citing Mach v. Will County Sheriff, 580 F.3d 495, 499 (7th Cir. 2009).

If Plaintiff proceeds under the indirect, burden-shifting method, Plaintiff must prove the following to make a prima facie:

> (1) that she is a member of a protected class;
> (2) that she applied for and was qualified for an open position,
> (3) that she was rejected for the position; and
> (4) that the position was filled with a person not in the protected class who had similar or lesser qualifications than the plaintiff.

Grisby v. LaHood, 628 F.3d 354, 358 (7th Cir. 2010). Id. If the prima facie case is established, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the personnel action. Id. at 359. If the employer meets this burden, the plaintiff can survive summary judgment only by showing that the employer's reason was pretextual. Id.

---

[5] Although Plaintiff asserts in her Amended Complaint that her case is brought for "sex discrimination, retaliation, and age," Plaintiff makes no specific averments to support an age discrimination claim (or even mentions age again in the Amended Complaint). Moreover, the only specific allegation in the Amended Complaint regarding retaliation is contained in paragraph 30 in which Plaintiff alleges that Defendants retaliated against her "because she was female." As explained below in Section IV(C), Defendants assume that "retaliation" claim is actually part of her gender discrimination claim given that she made no specific averments to support a claim of retaliation.

*1. March 2012 Failure to Hire*

Plaintiff has no direct evidence of gender discrimination, nor can she make a prima facie case of gender discrimination based upon the City's failure to hire her for the full-time position in March 2012. Although Plaintiff is a member of a protected class who applied for and was rejected for an open position, she was not qualified for the full-time position given her extremely poor attitude, hostility, and insubordinate behavior. Gregory witnessed Plaintiff's insolence and the manner in which she undermined his authority in the first two months that he managed PCR. (Exh. D, pp. 54-56). Also, even though Plaintiff was physically capable of performing the work and had significant experience performing the work at PCR, she was not more qualified than the person hired. The full-time utility position is an unskilled labor position that requires general mowing and maintenance work. Realistically, most individuals could perform this type of work as long as they are able to follow instructions and treat co-workers with respect. During Gregory's time as superintendent, Plaintiff demonstrated that she was unwilling to work within these parameters. Moreover, an applicant with a CDL was preferable because the employee could then operate the garbage truck at PCR, which drastically reduced the amount of time spent collecting trash at PCR (allowing the employees more time to focus on other projects). The full-time position was filled by Upchurch. Upchurch had a great deal of experience in this field of work as he had been self-employed in a lawn care and snow removal business since 2005. Unlike Plaintiff, he also had a CDL learner's permit. Plaintiff did not have a CDL learner's permit or a CDL. Therefore, Plaintiff is unable to prove that she was equally or more qualified for the position.

Moreover, Plaintiff testified that Mayor Tyler told her that Upchurch was hired as a political favor. (Exh. B, pp. 183:23-184:6; 188:6-15, Exh. 6). Basing a hiring decision on

nepotism or friendship is not illegal, and actually supports that the decision-maker was not making a discriminatory decision based upon a protected category. Bickerstaff v. Nordstrom, Inc., 48 F.Supp.2d 790, 800 (N.D. Ill. 1999) ("Moreover, assuming *arguendo* that Plaintiff's account is accurate and that Ms. Love told him that Mr. Barry's family situation was crucial to the hiring, that does not necessarily give rise to an inference of racial discrimination. Rather, this Court would logically infer that the decision was based on nepotism, and nepotism, while disreputable, is not illegal."); Ferguson v. Foster Wheeler Constructors, Inc., 1999 WL 528196, fn. 4 (N.D. Ill. 1999) ("Nepotism might not be a good means for making employment decisions; however, the discrimination laws are not aimed at stopping employers from using 'bad' motivations, but only at stopping employers from using *discriminatory* employment motivations."). *See also* Varga v. Clark Foodservice of Indiana, 240 F. Supp.2d 851, 858 (N.D. Ind. 2003).

In conclusion, Plaintiff is unable to make a prima facie of discrimination based upon the City's failure to hire her for the full-time position in March 2012 because she is unable to show that she was equally or more qualified than Upchurch for the position. Moreover, if the court relies on Plaintiff's testimony regarding this issue, then Plaintiff's testimony that Mayor Tyler told her that Upchurch was hired as a political favor shows that the reason she was not hired was not because of her sex.

### 2.  August 2012

Plaintiff alleges that she submitted another application for the full-time position in August 2012.  (Amd. Compl. ¶ 26).  Defendants deny ever getting this application and Plaintiff has not produced a copy of the same.  Assuming *arguendo* that Plaintiff actually submitted an application for this full-time position, she would not have been qualified because she did not

possess a CDL.  The job description for the position required the applicant to possess a valid CDL.  Id. at ¶ 21 and Exh. 8.  Cody McCord applied for the position, possessed a CDL, and was hired to fill the position.  Id. at ¶ 22 and Exh. 9.  Summary judgment should be entered in Defendants' favor on this claim because Plaintiff cannot make a prima facie case of discrimination based upon this particular failure to hire.

### 3. Termination in October 2012

Plaintiff alleges that "[o]n or about October 19, 2012, the Plaintiff's supervisor, Mr. Ivan Gregory, told the Plaintiff she was being laid off for monetary reasons when in fact the Defendants had hired male employees to work at Prairie Creek Reservoir, including but not limited to retired firemen and member of their families to work at the reservoir." [*Sic*].  (Amd. Compl. ¶ 27).  Plaintiff identified James Upchurch, Cody McCord, and Mitch Upchurch, as the retired firemen and/or family members that were hired, but clarified that McCord, James Upchurch, and Mitch Upchurch were all employed at PCR when she was terminated on October 22, 2012.  (Exh. B, pp. 52:13-54:24).  As explained below, Plaintiff is unable to make a *prima facie* case of gender discrimination based upon her termination at the end of the 2012 PCR season.

Under the direct method, a plaintiff can offer direct or circumstantial evidence of discrimination.  Id.; Diaz v. Kraft Foods Global, Inc., 653 F.3d 582, 586-87 (7th Cir. 2011). Direct evidence of discrimination, which is rare, is typically 'an outright admission by the decisionmaker that the challenged action was undertaken because of the plaintiff's [protected class].'  Chaib, 2014 WL 685274 at 4; Diaz 653 F.3d at 587.  A plaintiff proceeding under the direct method using circumstantial evidence must "'construct a convincing mosaic' that would permit a jury to infer intentional discrimination."  Chaib, 2014 WL 685274 at 4.  The mosaic

typically includes three types of evidence: (1) "'suspicious timing, ambiguous statements oral or written, and other nits and pieces from which an inference' of discrimination could be drawn; (2) 'evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently;' or (3) 'evidence that the employer offered a pretextual reason for an adverse employment action.'" Id.

If Plaintiff proceeds under the indirect, burden-shifting method to prove that she was discriminated against when terminated at the end of the 2012 season, Plaintiff must establish a prima facie case by showing: '(1) she is a member of the protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably.' Id. If Plaintiff makes a prima facie case, then the burden shifts to the employer to 'introduce a legitimate, nondiscriminatory reason for the employment action.' If the employer is able to show a legitimate, nondiscriminatory reason for the employment action, the Plaintiff has the burden to show that the proffered reason was a pretext. Id.

Plaintiff has no evidence to prove discrimination through the direct method, so she must establish a prima facie case of discrimination under the indirect, burden shifting method. Although Plaintiff is a member of a protected class and suffered an adverse employment action when she was terminated, she is unable to show that she met her employer's legitimate job expectations or identify *any* similarly situated employees outside of the protected class who were treated more favorably. In fact, Plaintiff was treated *more* favorably than at least one male part-time laborer, namely Steven Chrisp.

Plaintiff's failure to meet her employer's legitimate job expectations is documented in her discipline actions. Simply put, Plaintiff was insubordinate, rude, and hostile toward her co-

workers, and refused to follow management's instructions to not engage other employees about how she thought they should do their jobs. Her attitude towards management and co-workers is perhaps best reflected by her comments on the Disciplinary Action Form that she signed on August 1, 2012, which included: "I did not tell Chrisp (African-American male) what to do, I told him I put a 1 x 4 in end of board so boards would be closer together. I did not tell that boy what to do." (Exh. B, pp. 118:7-119:20, Exh. 3). Plaintiff admitted that referring to an African-American man as a "boy" would be disrespectful and she swore that she would never make such a remark, but when confronted with her statement admitted she had made such a remark on her Disciplinary Action Form. (Exh. B, pp. 116-:18-118:2-119:20)

Plaintiff's claim for gender discrimination fails when her good friend and co-worker, Eldon Cook, said that both he and Plaintiff were treated unfairly because Gregory did not like them. (Exhibit H- Deposition of Eldon Cook, pp. 28:19-21, 33:2-8, 41:1-43:17, 61:4-17, 63:4-64:19). Thus, Plaintiff's claims of adverse action have nothing to do with her gender. Indeed, other male employees have been disciplined for misconduct. Two *male* part-time laborers (Darryale Hawkins and Curtis Young) were terminated during the 2012 season after their incident of misconduct. (Exh. C, ¶¶ 20-22, Exhs. 7-8). In fact, Hawkins was terminated for insubordination.

Finally, Plaintiff cannot show that similarly situated employees outside of the protected class were treated more favorably. In fact, Plaintiff cannot identify any similarly-situated employees at PCR (let alone any that were treated more favorably), nor does she know whether any part-time employees holding a position similar to hers were treated better than her. (Exh. B, pp. 158:4-17, 170:3-20, 248:17-249:5). Gregory was forced to terminate part-time laborers at the end of the PCR season due to PCR's needs and resources. Indeed, relative to her termination,

Plaintiff was treated the same, if not better, than the other part-time male laborers at PCR.   For example, on September 17, 2012, Gregory told Steven Chrisp (part-time PCR laborer) that Chrisp could work the remainder of the week but that his employment would end the week of September 24, 2012.  Chrisp did not return to work on the afternoon of Friday, September 21, 2012.  Had Chrisp returned to work on September 21, 2012, his employment would have ended the following week.  (Exh. C, ¶ 20, Exh. 9).  On the other hand, Plaintiff's employment did not end until October 22, 2012.

### C. Summary Judgment Should Be Entered for Defendants on Any Alleged Retaliation Claim Because Plaintiff Has Not Stated a Claim for Retaliation.

Pursuant to Title VII, it is unlawful 'for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII].'  Tomanovich v. City of Indianapolis, 457 F.3d 656, 661 (7th Cir. 2006), *quoting* 42 U.S.C. § 2000e-3(a).  A plaintiff must prove retaliation by using the direct method or the indirect, burden-shifting method.  Under the direct method, the plaintiff must show that "(1) she engaged in statutorily protected activity; (2) she suffered an adverse action taken by the employer; and (3) [there was] a causal connection between the two." Tomanovich, 457 F.3d at 663.  A plaintiff can make a prima facie case of retaliation under the indirect method by showing the same four elements discussed, supra.  If she can establish a prima facie case, then the burden shifts to the employer to present evidence of a non-discriminatory reason for its employment action.  If the employer presents a non-discriminatory reason, then the burden shifts back to the plaintiff to prove that such reason(s) are pretextual.  Id.

As indicated in footnote 4, Plaintiff does not allege that she was retaliated against for engaging in a statutorily protected activity.  She alleges only that she was retaliated against because she is a female, which would be considered part of her gender discrimination claim.

Plaintiff    As explained above in Section IV(C), Defendants assume that "retaliation" claim is actually part of her gender discrimination claim given that she made no specific averments to support a claim of retaliation.

## V.  CONCLUSION

Based on designated evidence and the foregoing arguments, the Defendants are entitled to summary judgment on all of Plaintiff's claims.

Respectfully submitted,

**COOTS, HENKE & WHEELER, P.C.**

 /s/ Brandi A. Gibson
Matthew L. Hinkle, #19396-29
Brandi A. Gibson, #26373-29
John V. Maurovich, #28672-29
*Attorneys for City of Muncie and
Muncie Parks Department*

## CERTIFICATE OF SERVICE

I hereby certify that on the **12th day of September, 2014**, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operations of the Court's electronic filing system.  Parties may access this filing through the Court's system.

John R. Panico
**PANICO LAW LLC**
jpanico@discriminationlawgroup.com

/s/ Brandi A. Gibson
Matthew L. Hinkle, #19396-29
Brandi A. Gibson, #26373-29
John V. Maurovich, #28672-29

**COOTS, HENKE & WHEELER, P.C.**
255 East Carmel Drive
Carmel, IN 46032
(317) 844-4693 - telephone
(317) 573-5385 - facsimile
Email: mhinkle@chwlaw.com
        bgibson@chwlaw.com
        jmaurovich@chwlaw.com