UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DOROTHY  CAIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-01127-SEB-MJD |
| | ) | |
| CITY OF  MUNCIE, | ) | |
| MUNCIE PARKS DEPARTMENT, | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on Defendants' motion for summary judgment [Docket No. 54], filed on September 12, 2014 pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the motion is GRANTED.

### Factual Background[1]

Plaintiff Dorothy Cain worked as a part-time laborer with the Defendant Muncie Parks Department, a division of the City of Muncie, from 2004 to October 22, 2012. Her primary place of employment was Prairie Creek Reservoir ("PCR"), a municipal park that offers camping, swimming, playground, beach, and food amenities. Plaintiff's job, which in some years was seasonal during the summer and other years continued year-round, involved unskilled grounds keeping and maintenance work, including cleaning restrooms, mowing, and seasonally inserting and removing piers on the shore of the reservoir. Defs.' Ex. C at ¶¶ 3–4; Cain Dep. 57:8–14.

---

[1] Plaintiff violated Southern District Local Rule 56-1(b) by failing to include in her response brief a "statement of material facts in dispute." While we exercise our discretion not to enforce this rule strictly, Plaintiff's omission has the effect that all "facts as claimed and supported by admissible evidence by the movant are admitted without controversy." *See* S.D. Ind. L.R. 56-1(f)(1). We consider any evidence cited by Plaintiff in her response brief, but in the absence of a specific reason to think otherwise as presented in the response, we consider Defendants' statement of undisputed material facts just that—undisputed.

The 2011 elections produced a political party change in Muncie's administration, when a new Democratic mayor, Dennis Tyler, took office on January 1, 2012. Shortly after assuming office, Tyler hired Ivan Gregory as the new parks superintendent; according to both Plaintiff and Gregory himself, Gregory employed a more hands-on style of management that intruded on the independence that many of the PCR employees had previously enjoyed in completing their day-to-day tasks. *See* Cain Dep. 79:24–81:6; Gregory Dep. 55:10–12. Although there is no evidence of Plaintiff having any disciplinary issues before 2012, Cain Dep. 62–74, Gregory recounts that he began to have difficulties with her soon after assuming his position in January of that year. Gregory Dep. 54:24–56:8.

In February 2012, a position as a full-time maintenance worker at PCR became available, and Plaintiff submitted an application for the position on February 28, 2012. *See* Defs.' Ex. A-4. The parks department ultimately chose James Upchurch, a white male who had a commercial driver's license ("CDL"), for the position; although the possession of a CDL was not a written requirement for the position, the department has stated that applicants with CDLs were preferred. Gregory Aff. ¶ 9. According to Plaintiff and her co-worker Eldon Cook,[2] Gregory told Plaintiff that Upchurch was not necessarily a stronger candidate for the position than her, but had been hired by the city for political reasons. Cain Dep. 179; Cook Aff., Ex. A. When she inquired of Mayor Tyler why she had not been given the job, Plaintiff recalls that Tyler told her that Upchurch would soon be transferred to the Street Department and she might get the full-time PCR maintenance position in time, if she were patient. Cain Dep. 188.[3] In July 2012, Upchurch

---

[2] In her 2012 EEOC charge, Plaintiff describes Cook as a "union steward," though any union capacity he may have had does not appear to be relevant here.

[3] In materials he submitted in conjunction with Plaintiff's EEOC charges, co-worker and friend Eldon Cook asserts that Gregory gave Plaintiff undesirable work assignments after she had inquired of him why she had been passed over for the full-time position. Cook Aff., Ex. B. ("After March 13 [2012] when Dorothy was passed over for

was in fact transferred to the Street Department, and the city began accepting applications again for the full-time PCR position; this time, the job description did explicitly list the possession of a valid CDL as a job requirement. Plaintiff asserts that she applied for this renewed vacancy, although the city denies that there is any record of her having done so. On October 1, 2012, the city hired Cody McCord, a male who possessed a valid CDL, to fill the position. Defs.' Ex. A at ¶¶ 15–20.

In the meantime, Plaintiff continued to work part-time at PCR. In the spring of 2012, she asserts that co-workers—primarily Kevin Rabenstein and Nathan Burgess[4]—engaged in inappropriate conduct which supervisors failed to remedy. Around April 2012, Rabenstein handed her a sheet of paper containing two low-quality black-and-white photographs that showed Rabenstein and Burgess "mooning" the camera with partially exposed buttocks. Pl.'s Ex. B. Plaintiff also asserts that, around the same time, Burgess asked her if she wanted to see his "pierced penis." Cain Dep. 208; Cook Dep. 16–17.[5] On a third occasion, Plaintiff alleges that Rabenstein was standing in his underwear near the front door of the garage in the employees' work area. She recounts that when she reproached him for appearing in the open in his underwear, "[h]e said, [']You want to tuck a buck?['] I said, [']No thanks,['] and I walked out."

---

promotion, by a male, she ask [sic] why and things got worse. She was given jobs unsafe [sic], cleaning [a] busy county road alone."). Because Plaintiff does not point to this alleged poor treatment in support of her discrimination, harassment, or retaliation claims in her opposition to summary judgment, we do not address it in detail.

[4] There is inconsistency in the record regarding the spelling of both of these last names. In both cases, we adopt the spelling which seems to us to occur most commonly in the documents.

[5] Plaintiff's Response brief claims that Rabenstein spoke to Plaintiff on "numerous occasions" about his penis piercing. Cook's deposition concedes, however, that there was only one "face-to-face" conversation between Rabenstein and Plaintiff about it, even if Rabenstein spoke about it to other employees on other occasions. Cook Dep. 16–17. The portion of Cain's deposition which Plaintiff cites as supporting her position, page 208, is not actually included in the designated evidence. Because there is additional corroborating testimony as to this particular factual claim, however, we still consider it—but we must construe it as Cook described it, meaning that the conversation took place just once.

Cain Dep. 245.[6] According to affidavits filed by both Plaintiff and co-worker Eldon Cook, unspecified male employees made a practice of urinating in the parking lot near where Cook and Plaintiff worked; it is not clear from the designated evidence whether any of these male employees actually exposed themselves to Plaintiff or were aware that she could see them when they were relieving themselves in this fashion. Cain Aff. at ¶ 13; Cook Aff. at ¶ 7.[7]

Plaintiff alleges that her supervisor, Ivan Gregory, was in the room when Rabenstein handed her the "mooning" photo. Cain Dep. 41.[8] She also brought the photo to the attention of Gregory's secretary, Janet Bonham, in April 2012, but received the impression that the parks department would not be taking any disciplinary action. *Id.* at 43.[9] Plaintiff also maintains that she complained to the city's human resources director, Sara Beach, about the photo. Beach Dep. 44. There is no record of Plaintiff registering any complaint with her supervisors, or other city officials, about any of the other alleged inappropriate behavior by her co-workers.

Plaintiff also had her own disciplinary problems in the summer of 2012. On July 5, two PCR employees—one of whom was the aforementioned Kevin Rabenstein—complained to Gregory that Plaintiff had yelled and cursed at them and had been disrespectful to other employees. Gregory Aff., Exs. 2–3. Gregory gave Plaintiff a written disciplinary warning that same day, and he presented her with a "disciplinary action form" at a meeting four days later

---

[6] Plaintiff interprets this remark as Rabenstein insinuating that she was a stripper. Pl.'s Resp. 2 n.2. In context, it seems rather to imply that Rabenstein—the one in his underwear—was a stripper; he was (we assume sarcastically) inviting Plaintiff to place a dollar in his underwear—"tuck a buck."

[7] Defendants urge us to disregard the allegation concerning urinating co-workers on the grounds that it contradicts Plaintiff's assertion, in her deposition testimony, that the mooning incident, the "tuck a buck" incident, and the pierced penis remark were the only offensive incidents she could recall. Cain Dep. 259. Because the Cook affidavit seconds Cain's assertion, however, and Cook's allegations of public urination well pre-date the Cain deposition, we do not need to consider whether Plaintiff's new assertion violates the "sham affidavit" rule.

[8] According to co-worker Eldon Cook, Plaintiff also complained about the photograph to Gregory several months later, in July 2012. Cook Dep. 18–19.

[9] Bonham denies that Plaintiff ever complained to her about the photo or any other matter concerning sexual harassment. Bonham Dep. 13.

attended by him, Plaintiff, and HR director Beach. *Id.* at ¶¶ 12–13. Beach recounts that she told

Plaintiff at this July 9 meeting that Plaintiff should not instruct other employees on how to

perform their jobs, and that further complaints of abusive language or behavior could result in

her termination. Beach Aff. at ¶ 22. On July 13, Plaintiff had another run-in with a co-worker:

Steven Chrisp, who had been working on building walk-boards for a pier, complained that

Plaintiff approached him and instructed him on how she felt the walk-boards should be

constructed. Beach Aff. at ¶¶ 23–24; Gregory Aff. ¶¶ 14–15. In response, Gregory gave Plaintiff

a second written warning and conducted a disciplinary meeting with her on August 1. Gregory

Aff., Ex. 6.

On August 30, 2012, Plaintiff filed an EEOC charge alleging sex and age discrimination

based on the parks department's failure to hire her for the full-time job for which he had applied

earlier in the year. The charge document, signed by Plaintiff, stated her grievance against the city

as follows:

> I have been a good a long term employee [sic] during my many years with the
> City and the Parks Dept.
>
> On or about Feb 2012 I had applied for a utility person/groundskeeper/building
> maintenance position. I was very qualified for the position. I later asked my
> supervisor, I. Gregory, about the job and he told me that I would get the job. On
> or about Mar 12, 2012, I along with the union steward E. Cook ask[ed] Mr.
> Gregory about me getting the job. Mr. Gregory stated that I didn't' get the job and
> he took me to ask the Mayor why I didn't get the job. I then went to speak with
> Mayor Dennis Tyler about the job. Mayor Tyler told me that he had to put
> someone else in the job as a political favor to a supporter. I told him that I thought
> this was discrimination due to my age and my sex. I have also complained to
> human resources about not getting the job. But nothing was done to help me. Also
> since I have complained, my supervisor has been retaliating against by me [sic]
> being written up without just cause. I believe the City/Parks Dept is now trying to
> terminate my employment.

Defs.' Ex. B-6. Although the EEOC charge does not mention any of her co-workers' alleged

misbehaviors, Plaintiff stated on her initial EEOC "intake questionnaire" that her co-worker

Eldon Cook, whom she listed as a witness in her favor, could testify as to "sexual harassment." Pl.'s Ex. H.

On October 22, 2012, the city terminated Plaintiff as a part-time employee. She was one of several employees terminated between September and November 2012 either for cause or because they were seasonal employees. According to Gregory, all of the employees who were terminated or voluntarily quit before November 2012 would have been laid off at the end of the season anyway; only a small number of employees were retained over the winter. Although Plaintiff was not terminated for cause, Gregory determined at the end of the 2012 season that he would not re-hire her for the 2013 season as he had in the past. Gregory Aff. ¶ 18. Two days after her termination, Plaintiff filed a second EEOC charge against the parks department. In it, she alleged that she had been laid off in retaliation for filing her August 2012 EEOC charge. Defs.' Ex. B-8. After learning in March 2013 that she would not be re-hired for the 2013 season, Plaintiff filed a third EEOC charge. Again asserting that she was the victim of sex discrimination and retaliation, she alleged that the department had hired several new, less-qualified employees and that its decision not to re-hire her was in retaliation for her two prior EEOC complaints. Defs.' Ex. B-9.

Plaintiff filed an initial complaint in this Court on July 15, 2013, superseded by an amended complaint on August 14, 2013. *See* Docket No. 11. Some nine months later, on April 18, 2014, she filed a fourth EEOC charge alleging sexual harassment.

<u>Legal Analysis</u>

**Discussion**

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986).  The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Plaintiff points to *Courtney v. Biosound, Inc.*, 42 F.3d 414 (7th Cir. 1994), in support of her argument that, "[w]ith respect to summary judgment motions in employment discrimination cases, the burden on the moving party is increased." Pl.'s Resp. 5. The *Courtney* court stated that "the summary judgment standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues. Because evidence directly supporting a claim of intentional discrimination is rare, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." 42 F.3d at 418 (internal citations omitted). While the Seventh Circuit has thus recognized that courts should be cognizant of the importance of circumstantial proof in meeting a plaintiff's evidentiary burden in discrimination cases, Plaintiff mischaracterizes both *Courtney* and the summary judgment

7

standard in contending that we impose a heightened burden on moving parties in such cases.

Rather, the standard governing summary judgment applies with the same force to Title VII cases

as it does to other civil actions:

> Language in some of our cases implies that because intent is a critical issue in employment discrimination cases, summary judgment is unlikely to be appropriate in such cases. *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 918 (7th Cir. 1996); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038, 1042 (7th Cir. 1993); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312–1313 (7th Cir. 1989). But as there is not a separate rule of civil procedure governing summary judgment in employment discrimination cases, what the language we have referred to really means is just that courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be.

*Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997). Our attentiveness to

circumstantial modes of proof notwithstanding, Defendants face no higher burden in prevailing

on their motion for summary judgment than does any moving party under Rule 56.

## Discussion

Plaintiff's claim against the City of Muncie and the Muncie Parks Department under Title

VII of the Civil Rights Act consists of three legal theories: "hostile environment" sexual

harassment, disparate treatment sex discrimination, and retaliation.[10] We ultimately conclude that

summary judgment is warranted because Plaintiff is unable to create a genuine issue of material

fact with respect to any of her three theories of recovery.

## I.      Sexual Harassment

---

[10] The introductory section of Plaintiff's Amended Complaint announces that "[t]his case is brought by Plaintiff for sex discrimination, retaliation, and *age* [discrimination]." Am. Compl. ¶ 1. (emphasis added). Plaintiff never mentions age discrimination elsewhere in the Amended Complaint, nor does she plead any facts consistent with age discrimination or argue an age discrimination theory in her briefs. She has therefore abandoned any claim she might once have intended to bring for age discrimination.

Plaintiff alleges that Defendants are liable for the hostile work environment created by the inappropriate, sex-based behavior of her co-workers. Before we turn to the merits of this claim, we must address Defendants' contention that any allegations of sexual harassment are barred because Plaintiff did not raise them in any of the three EEOC charges she filed before bringing this civil suit.

**A. The EEOC charges**

Plaintiff filed three EEOC charges against the city and parks department in 2012 and 2013—none of which, on their face, contained any mention of sexual harassment or a hostile work environment. Defendants contend that Plaintiff has therefore failed to exhaust her administrative remedies with respect to sexual harassment, thus barring any recovery on that claim. Defs.' Br. 9.

"As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)). This rule serves two related purposes: it gives the employer some fair warning of the nature of the misconduct of which it is being accused, and it affords the EEOC and employer a chance to settle the dispute through means short of litigation. *Id.*; *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992); *Risk v. Ford Motor Co.*, 48 F. Supp. 2d 1135, 1145 (S.D. Ind. 1999).

Nevertheless, because most EEOC charges are completed by laypersons rather than by lawyers, a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint. *Cheek,* 31 F.3d at 500 (citing *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir. 1992)). "The test for determining whether an EEOC charge encompasses the claims in a complaint therefore grants the Title VII plaintiff

significant leeway: all Title VII claims set forth in a complaint are cognizable that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Id.* (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976)).

As Defendants have pointed out, Plaintiff's present claim that she suffered sexual harassment is neither reasonably related to the grievances listed on her EEOC charges nor a natural outgrowth of them. The first EEOC charge, filed in August 2012, complains that Plaintiff was passed over for the full-time PRC job and alleges that Gregory had retaliated her after she had inquired about being passed over. Defs.' Ex. B-6. The two subsequent charges repeat these allegations of sex discrimination and retaliation in relation to Plaintiff's termination and the city's failure to re-hire her in the spring of 2013, respectively. Defs.' Exs. B-8, B-9. Plaintiff's sexual harassment allegations, by contrast, focus on an entirely different set of facts and a different set of individual actors—her co-workers, chiefly Kevin Rabenstein and Nathan Burgess, rather than the supervisors responsible for hiring decisions. *Cf. Cheek,* 31 F.3d at 501 ("[T]he EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals.*") (emphasis original). As the Seventh Circuit has recognized, a sexual harassment claim that is "wholly diverse" from the allegations of disparate treatment described in an EEOC charge is subject to summary judgment on failure-to-exhaust grounds. *Vela v. Village of Sauk Village,* 218 F.3d 661, 664 (7th Cir. 2000).

On occasion, however, we look beyond the four corners of the EEOC charge if other evidence shows that, despite the language of the final document, the employee intended to raise additional issues before the EEOC. "Allegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations." *Vela,* 218 F.3d at 664. Plaintiff urges us to do so here, relying heavily on the

example provided by the Northern District of Indiana's decision in *Sickinger v. Mega Systems, Inc.*, 951 F. Supp. 153 (N.D. Ind. 1996). There, the court took into account the contents of a plaintiff's EEOC intake questionnaire, in which she had raised allegations of retaliation not reflected in the final EEOC charge submitted to the employer. In an affidavit, the plaintiff in *Sickinger* further stated that she had orally raised concerns with an EEOC representative regarding whether the charge document fully reflected her grievance; after being assured that the form was filled out correctly, she signed. 951 F. Supp. at 157–158. While acknowledging that considering the intake questionnaire would frustrate one of the goals of the EEOC exhaustion requirement—formal employer notification—the court reasoned that lenity was warranted because "the plaintiff has done everything a person can reasonably be expected to do to properly present her claim to the EEOC." *Id.* at 157. *See also Finley v. Ill. Dep't of Public Aid,* 1998 WL 26156, at *5 (N.D. Ill. Jan. 12, 1998) (approving the consideration of an intake questionnaire, citing *Sickinger*).

Although it is less clear here than in *Sickinger* that Plaintiff made a good-faith effort to raise the issue of sexual harassment with the EEOC, we find that the lenient attitude adopted by the court in that decision is fitting here. The Seventh Circuit has instructed us to keep in mind that it is generally laypersons, not lawyers, who file EEOC charges. *Teal v. Potter,* 559 F.3d 687, 691 (7th Cir. 2009). The form prompt language of the EEOC questionnaire that Plaintiff filled out speaks uniformly in terms of employment "discrimination"; while Plaintiff checked boxes indicating she had suffered retaliation and discrimination according to sex and age, there is no box to check for sexual harassment. And though the only specific grievance she listed when prompted "what happened to you that you believe was discriminatory?" was that she was passed over for the full-time position, she listed Eldon Cook as a witness who could testify to "what he

heard Dennis Tyler say, also the treatment from Ivan Gregory, hostile [sic], punishment,

retaliation[,] Kevin Rabinstein, Nathan Burgess – Sexual Harassment – proof." Pl.'s Ex. H at ¶¶

6, 13. It is plausible that Plaintiff, like many laypersons, would have thought that sexual

harassment is a separate grievance from "discrimination"—and that she failed to list harassment

under the heading of "discriminatory" conduct she suffered based on that misunderstanding.

Additionally, co-worker Eldon Cook avers that he provided the EEOC with a statement—

attached to his affidavit and dated September 30, 2012—describing the penis ring and

"mooning" photograph incidents. Cook Aff., Ex. A. Plaintiff herself swears in her affidavit that

she intended to raise the sexual harassment issue at the time, that she discussed the issue with

EEOC investigator James Love, and that she "do[es] not know why the sexual harassment charge

was omitted." Cain Aff. at ¶¶ 5–9.

  Plaintiff has pointed to facts supporting an inference that she brought the sexual

harassment allegations to the attention of the EEOC while attempting to file her charge. *See*

*James F. Jackson v. Local 704, Int'l Brotherhood of Teamsters, AFL-CIO,* 2002 WL 460841, at

*3 (N.D. Ill. Mar. 26, 2002) (considering the contents of a questionnaire concerning racist

workplace remarks where, "at a minimum, [plaintiff] brought the remarks to the attention of the

EEOC"). She has done so not merely by making an unverifiable assertion that she communicated

the allegations to the EEOC representative orally, but by reference to her written form and to

written documents contemporaneously submitted by a co-worker in her support. *Cf. Vela,* 218

F.3d at 665 n.2 ("We would not agree . . . that a claim orally communicated to the agency, but

omitted through the latter's fault could, simply on that account, be treated as if properly filed.").

*See also Jackson,* 2002 WL 460841, at *3 ("[T]he combination of the writings and Jackson's

description of the interview suggests that he did everything he could reasonably be expected to

do to preserve his racial harassment claim."). Because we are wary of imposing "a procedural barrier to the plaintiff's claims when the possibility exists that error lies with the administrative agency," we are therefore inclined to give Plaintiff the benefit of the doubt on this issue and consider the substance of her allegations. *See Santos v. Rush-Presbyterian-St. Luke's Medical Ctr.*, 641 F. Supp. 353, 354 (N.D. Ill. 1986). *See also Finley,* 1998 WL 26156, at *5 (concluding that the contents of a charge questionnaire should be considered because the plaintiff "should not be penalized for the charge's technical shortcomings").

## B. Merits of the hostile work environment claim

Even if it is not procedurally barred, however, Plaintiff's claim for hostile work environment sexual harassment nonetheless fails. Her allegations, taken as true, describe a level of workplace misconduct that fails to cross the relatively demanding Title VII threshold.

The creation of a hostile work environment by sexual harassment has long been recognized to violate Title VII's prohibition on sex discrimination. 42 U.S.C. § 2000e-2(a)(1); *Benders v. Bellows & Bellows*, 515 F.3d 757, 768 (7th Cir. 2008). In order to prevail on a hostile work environment claim, a plaintiff must establish the following elements: (1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her gender; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability. *Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 862 (7th Cir. 2011); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009); *Dear v. Shinseki,* 578 F.3d 605, 611 (7th Cir. 2009).

The Supreme Court and the Seventh Circuit have cautioned that "Title VII is not a civility code." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); *Patton v. Keystone RV Co.*, 455 F.3d 812, 815 (7th Cir. 2006). Rather, the statute protects only against

work environments sufficiently abusive that they "alter the conditions of employment." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986)). Though a precise taxonomy of offending conduct, free of context, is impossible, we have often cited the summary of the dividing line provided by the Seventh Circuit in *Baskerville v. Culligan International Co.*, 50 F.3d 428 (7th Cir. 1995):

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

50 F.3d at 430. Moreover, because the conduct in question must be either severe *or* pervasive, we measure allegations according to a sliding scale of sorts: at one end of the spectrum, one exceptionally severe incident may be sufficient to trigger liability; at the other end, an unrelenting string of less grave provocations may have the same effect. *Patton,* 455 F.3d at 816; *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 808 (7th Cir. 2000).

Here, Plaintiff's allegations do not describe an environment in which sex-based harassment was "pervasive." *Cf. Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1456 (7th Cir. 1994). In support of Plaintiff's hostile environment claim, she and Cook point to four incidents: in March 2012, Rabenstein asked her if she wanted to "tuck a buck"; in April 2012, Rabenstein handed her a photo of himself and Burgess mooning the camera; near the same time, Burgess asked if she wanted to see his penis piercing; finally, at an unspecified time, co-workers could be seen urinating in the vicinity of her work area. Even assuming all four incidents occurred in the first half of 2012, their number and frequency qualify them as intermittent rather than unrelenting. *See Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that eight gender-related comments over several years was a pattern "too isolated and sporadic to

14

constitute severe or pervasive harassment"); *Baskerville,* 50 F.3d at 430–431 (concluding that

nine offensive incidents over seven months did not violate Title VII); *EEOC v. Caterpillar, Inc.*,

503 F. Supp. 2d 995, 1046 (N.D. Ill. 2007) ("Eight incidents over a three-year period cannot be

characterized as frequent.").

Nor do these four incidents, taken together, support an inference that Plaintiff suffered

workplace abuse severe enough to alter the conditions of her employment. There is no bright line

test for severity, but *Baskerville* and similar Seventh Circuit cases can serve as a "yardstick" and

furnish us some rules of thumb. *See Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir.

1997). First, we note that in none of these alleged incidents did her co-workers touch Plaintiff—

sexually or otherwise—and none can reasonably be interpreted as physically threatening. *Cf.*

*Baskerville,* 50 F.3d at 431 ("Mr. Hall, whatever his qualities as a sales manager, is not a man of

refinement, but neither is he a sexual harasser. He never touched the plaintiff . . . . He made no

threats."). *See also Scruggs,* 587 F.3d at 841 ("[H]is conduct was not physically threatening, as

he did not touch her or threaten to touch her."); *Gleason,* 118 F.3d at 1145 (citing *Baskerville*).

Second, none of the incidents amounts to a solicitation to sexual activity. *Cf. Patton,* 455

F.3d at 816 (citing *Baskerville,* 50 F.3d at 430). The incident in which Burgess asked Plaintiff if

she wanted to see his "pierced penis" certainly comes the closest. Such a comment, however,

falls just on the near side of the line separating "vulgar banter" from outright solicitation. The

court in *EEOC v. Caterpillar, Inc.*, 503 F. Supp. 2d 995 (N.D. Ill. 2007), grappled with a similar

distinction. There, a co-worker pulled the plaintiff onto his lap and asked: "Can't you do this

with me?" 503 F. Supp. 2d at 1046. The court found it reasonable to construe this as a sexual

solicitation, but determined that its impact on the plaintiff's working environment was likely

mitigated by the fact that the plaintiff simply said "no" and departed without further incident. *Id.*

The same court found that two other sexual comments did *not* qualify as solicitations to sexual activity: in one, a co-worker showed the plaintiff a "lewd" illustration of a deer with an oversized penis; in another, the plaintiff's supervisor "put his hands on his [own] pants and moved his penis around in a circular motion after having confided in [the plaintiff] that he was desperate and needed a girlfriend." *Id.* at 1045–1046. Here, we believe that Burgess's crude comments about his genitals are strikingly inappropriate for any workplace setting—but they represent "coarse and boorish" talk rather than an invitation to sexual conduct. *Cf. Gleason,* 118 F.3d at 1144 (recognizing that "a certain amount of vulgar banter, tinged with sexual innuendo is inevitable in the modern workplace, particularly from 'coarse and boorish workers'" such as the defendants in that action).

The "mooning" photograph that Rabenstein handed to Plaintiff is similarly crude and disrespectful, without necessarily running afoul of the Seventh Circuit's hostile environment benchmarks. It is well established, of course, that inflicting pornography on a subordinate or co-worker can create a hostile work environment based on sex. *See Baskerville,* 50 F.3d at 430; *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 387 (7th Cir. 2007) (finding that the fact that a co-worker "repeatedly tried to get [plaintiff] to join him in viewing pornography" could allow a jury to infer the presence of a hostile work environment); *Williams v. City of Chicago*, 325 F. Supp. 2d 867, 875–876 (N.D. Ill. 2004) ("In conjunction with this type of targeted conduct, workplace pornography contributes to [the plaintiff's] hostile work environment claim . . . ."). The photograph in question here, while undoubtedly juvenile, tasteless, and offensive, is not particularly pornographic; it contains two black-and-white, low-resolution images of otherwise-clothed men with their buttocks partially exposed to the camera. *See Crabtree v. Johnson,* 2014 WL 4249854, at *2 (S.D. Ohio Aug. 27, 2014) (granting summary judgment on a sexual

harassment claim premised partially on the display to the plaintiff of a "mooning" photograph). The incident's severity as a building block for a hostile work environment claim is mitigated somewhat by the gross and insulting—rather than explicitly sexual—nature of these images.[11] *Cf. Flick v. Aurora Equipment Co., Inc.*, 2004 WL 220859, at *4 (E.D. Pa. Jan. 13, 2004) (denying summary judgment where the plaintiff suffered harassment, on a daily basis for a long period of time, that included "one of her co-workers simulating masturbation directly in front of her . . . and another co-worker mooning Plaintiff and pulling up his shirt to show his 'hairy chest.'") (citing *Suders v. Easton,* 325 F.3d 432 (3d Cir. 2003)).

The two other incidents described by Plaintiff, though still inappropriate, are less severe. She alleges that Rabenstein, while in his underwear, asked her if she wanted to "tuck a buck." While joking about the idea of himself as a stripper is hardly work-appropriate, the "joke"—to cloak the remark with undeserved dignity—was on Rabenstein rather than Plaintiff. Appearing in public at work in underwear would ordinarily be offensive in its own right, of course, but Defendants' uncontroverted statement of facts establishes that PCR workers perform tasks such as installing and uninstalling piers, which requires workers to get in and out of water and wear "waders." Gregory Aff. at ¶ 4; Defs.' Br. 3 n.2. An inquiry into the objective severity of harassment "requires careful consideration of the social context in which the particular behavior occurs and is experienced by its target." *Oncale,* 523 U.S. at 81. Consideration of context also mitigates the objective severity of the final incident listed by Plaintiff: that she could see male employees urinating outdoors near the workplace garage. Outdoor urination may be coarse behavior in *any* setting, but it is less outrageous or unexpected in a largely outdoor work

---

[11] Plaintiff asserts, and we have no reason to second-guess, that she was "devastated" upon receiving this photograph. Cain Dep. 42. Her subjective response to the incident is a factor we must consider, but it is the objective severity of this incident—when weighed in conjunction with the severity and pervasiveness of the others—that proves the sticking point.

environment; here, the minimal description offered by Plaintiff and Cook gives us no reason to believe that this outdoor urination was targeted at Plaintiff, that any of the (unspecified) urinating co-workers exposed themselves to Plaintiff, or indeed that they were aware she could see them at all. *See Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 106 (W.D.N.Y. 2011) (granting summary judgment on a hostile environment claim where a male urinated in the plaintiff's presence, but "did not intentionally expose himself directly to her [and] rather, was indifferent to her presence").

Even if none of these four incidents would be severe enough to warrant a jury inference of a hostile work environment on its own, we must consider the allegations in their totality, determining whether they describe misconduct severe *or* pervasive enough to trigger liability. *See Vance v. Ball State Univ.*, 646 F.3d 461, 470–471 (7th Cir. 2011) ("When evaluating a hostile work environment claim, we consider 'the entire context of the workplace,' not the discrete acts of individual employees.") (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002)). Considered in light of Seventh Circuit precedent, we determine that the misconduct alleged by Plaintiff, if proven, was insufficient to alter the conditions of her employment. A number of decisions illustrate the strenuous nature of this test. In *Rogers v. City of Chicago,* 320 F.3d 748 (7th Cir. 2003), *overruled on other grounds by Hill v. Tangherlini,* 724 F.3d 965 (7th Cir. 2013), a police officer named Patricia Rogers filed a sexual harassment claim against supervisor Robert Kolenyi, alleging the following incidents of misconduct:

> (1) a comment by Kelenyi to Rogers that he would "like to be that FOP [Fraternal Order of Police book] in [her] back pocket";
> (2) when Rogers appeared to be slipping on the stairs, Kelenyi said "don't fall," caught hold of Rogers, and then asked Rogers whether she had a boyfriend or needed one;
> (3) a comment by Kelenyi to Rogers and Mark Kelly, one of Rogers's partners, during an evening check off, when they were turning in their daily reports of

18

activity (that showed high activity), that "[y]ou guys are the real police. What are you trying to do, get on the TAC team?";

(4) Kelenyi's interference with Rogers and Kelly's response to a domestic violence call;

(5) Kelenyi's threatening remarks to Rogers and Kelly that he had a problem with the two of them;

(6) Kelenyi's remark to Rogers, while exiting a locker room, that "Your breasts look nice in that turtleneck, that red turtleneck";

(7) Kelenyi's frequent appearance on jobs and calls of Rogers even when he was not her assigned Sergeant;

(8) Kelenyi's refusal to process, or to turn back, reports prepared by Rogers and Kelly;

(9) Kelenyi's ordering Rogers to put a document in a box at the end of the room, stating, "Put this in the bin so I can watch you walk over and put it in"; and

(10) Kelenyi's interference with the work of Rogers and another one of her partners in a robbery case.

320 F.3d at 750. The Seventh Circuit affirmed the lower court's grant of summary judgment, despite Rogers's allegations that her supervisor made several sexually offensive comments and even initiated physical contact with her on one occasion; citing the *Baskerville* benchmark, the court recognized that Title VII sets a high bar: "The workplace that is actionable is the one that is hellish." *Id.* at 752 (quoting *Perry v. Harris Chernin Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)). In contrast with *Rogers,* none of the alleged misconduct here involved outright touching or a sexual proposition, and the instances alleged by Plaintiff are significantly less numerous. *See also Baskerville,* 50 F.3d at 430 (involving nine incidents over a seven-month period).

Plaintiff might respond, with some justification, that *Baskerville* and its progeny are not the ideal comparators for the harassment of which she complains—that the mistreatment she suffered was grounded more in sexist hostility than inappropriate sexual interest.[12] "[C]onduct

---

[12] Plaintiff does not actually make such an argument, focusing instead on the (correct, but ultimately unhelpful) principle that the allegations must be considered in their totality rather than in isolation. *See* Pl.'s Resp. 12–13 (citing *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002)).

demonstrating 'anti-female animus' can support a hostile work environment claim . . . . In other words, a plaintiff can proceed on a claim when the work environment is hostile because it is 'sexist rather than sexual.'" *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840–841 (7th Cir. 2009) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007)).[13] Regardless of whether sexism or sexuality is the frame of reference, however, the conduct alleged falls short of the standard for liability. In *Scruggs v. Garst Seed Co.*, 587 F.3d 832 (7th Cir. 2009), for instance, the Seventh Circuit affirmed a grant of summary judgment where a plaintiff's male co-worker stated that he hated "pushy, aggressive women" and that the plaintiff was such a woman, said that she was "made for the back seat of a car" and looked like a "dyke," and subjected her to mistreatment that was not explicitly sex-based, such as hitting her with a clipboard. 587 F.3d at 836, 841. Here, Plaintiff's allegations paint a picture of a work environment that is far from ideal; in particular, they depict at least two of her co-workers as vulgar buffoons. As unfortunate as we may find the misconduct described in the complaint, precedent instructs us that Title VII is "not designed to purge the workplace of vulgarity." *Baskerville,* 50 F. 3d at 430. Because Plaintiff has failed to establish that any sex-based misconduct directed at her was severe or pervasive enough to alter the terms of her employment, we must grant summary judgment on her sexual harassment claim.

## II.    Disparate Treatment

Plaintiff's Amended Complaint, like her first three EEOC charges, alleges that she suffered disparate treatment on account of sex—in particular, that the city's failure to hire her for

---

[13] At the same time, however, a plaintiff must still demonstrate that that she suffered mistreatment *because of* her sex, and not for an entirely unrelated reason. *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345–346 (7th Cir. 1999). We can assume for the purposes of this motion, since Defendants do not argue otherwise and the assumption is plausible based on the facts, that Rabenstein and Burgess's actions were born out of sex-based animus.

a full-time position and its subsequent decision to terminate her part-time position were impermissibly based upon her status as a female. *See* Docket No. 11 at ¶¶ 9–11, 27–28, 31. Defendants devote a significant portion of their initial summary judgment brief to presenting arguments that Plaintiff has failed to make a *prima facie* case for disparate treatment under either the direct or indirect methods of proof. *See* Defs.' Br. 17–24. Plaintiff's response brief does not acknowledge these arguments, nor does it discuss the disparate treatment claim at all; instead, it focuses exclusively on sexual harassment and retaliation theories. *See* Docket No. 64.

Because Plaintiff has failed to delineate her disparate treatment claim in her response brief or address Defendants' arguments for summary judgment, she has abandoned the claim. *See Alioto v. Town of Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011); *Palmer v. Marion Cnty.*, 327 F.3d 588, 597–598 (7th Cir. 2003) (citing *Laborers' Int'l Union of N. Am. v. Caruso,* 197 F.3d 1195, 1197 (7th Cir. 1999)). We therefore grant Defendants' motion for summary judgment with respect to Plaintiff's disparate treatment claim under Title VII.

### III.   Retaliation

Plaintiff lastly alleges that she was terminated in the fall of 2012—and subsequently not re-hired in the spring of 2013—in retaliation for having complained about sexual harassment and for having filed an EEOC charge in August 2012 alleging sex discrimination. As in initial matter, Defendants contend that Plaintiff has impermissibly waited to raise this claim until filing her response to summary judgment, and they therefore urge that we consider it waived. *See* Defs.' Reply 13. *See also Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 412 (7th Cir. 2009); *Griffin v. Potter,* 356 F.3d 824, 830 (7th Cir. 2004). Defendants are correct to observe that the Amended Complaint mentions retaliation only in a minimal, and confusing, fashion; nonetheless,

it does raise the issue. In its opening paragraph, Plaintiff states that "[t]his case is brought . . . for sex discrimination, *retaliation* and age pursuant to Title VII of the Civil Rights Act . . . ." Am. Compl. ¶ 1 (emphasis added). A subsequent paragraph alleges: "As a result of the Defendants', and each of their [sic], failure to take appropriate steps to investigate and rectify the ongoing sexual discrimination by the Defendants, the Defendants retaliated against the Plaintiff because she was a female, and as a result, the Plaintiff is having a difficult time securing new employment . . . ." *Id.* at ¶ 30. In alleging that Defendants retaliated against her "because she was a female," Plaintiff muddles the distinction between retaliation for protected activity and sex discrimination.[14] Nonetheless, the Amended Complaint's explicit announcement of a Title VII claim for retaliation adequately put Defendants on notice, and the proper vehicle for a challenge to the complaint's sufficiency would have been a motion to dismiss. Plaintiff has now presented her argument in favor of the retaliation claim, and Defendants have had an opportunity to reply to it; we will therefore consider the issue on its merits. In doing so, we conclude that Plaintiff is unable to set forth a *prima facie* case for liability, and we accordingly grant summary judgment.

Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because [s]he has opposed any practice made an unlawful employment practice by [the rest of Title VII]." 42 U.S.C. § 2000e-3(a). A plaintiff may prove such a "retaliation" claim by either the direct method or the indirect, burden-shifting method. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005). Under the direct

---

[14] In their opening brief, Defendants took note of this confusion, and they therefore "assume[d] that [the] 'retaliation' claim is actually part of her gender discrimination claim given that [Plaintiff] made no specific averments to support a claim of retaliation." Defs.' Br. 18 n.5. As we have noted above, Plaintiff abandons any disparate treatment sex discrimination claim, and focuses wholly on her retaliation theory. Defendants' assumption, though certainly a justifiable one at the time, has thus proven incorrect. It would do injustice to Plaintiff to rule that, by displaying inadequate understanding of the boundaries between disparate treatment discrimination and retaliation, she has lost the ability to present *either* claim. Plaintiff elected to discard one and pursue the other, and we will not unduly penalize her for the somewhat confusing path she took to reach that decision.

method, a plaintiff must show that "(1) [s]he engaged in statutorily protected activity; (2) [s]he suffered an adverse action taken by the employer; and (3) [there was] a causal connection between the two." *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 661 (7th Cir. 2006). The indirect method, similar to the familiar *McDonnell Douglas* framework applied to disparate treatment claims, requires a plaintiff to show that: (1) she engaged in a statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.* Upon a successful *prima facie* showing, the burden shifts to the employer to present evidence of a non-discriminatory reason for its action, after which the plaintiff may provide evidence showing that the proffered non-discriminatory explanation is pretextual. *Moser,* 406 F.3d at 904.

Plaintiff here relies solely on the direct method of proof. She claims that she engaged in protected activity by complaining of sexual harassment to her supervisor Ivan Gregory and his secretary Janet Bonham and then by filing an EEOC charge, and that Defendants retaliated by issuing her disciplinary write-ups in July 2012, terminating her in October 2012, and failing to re-hire her in spring 2013. Pl.'s Resp. 15–16. She argues the "suspicious timing" of the discipline and termination provides sufficient circumstantial evidence of a causal link between her protected activity and the adverse employment action. *Id.* at 16–18. We may assume for the purposes of this motion that Plaintiff engaged in protected activity and suffered adverse employment actions, but she has failed to satisfy the third, crucial causation prong of the direct method of proof.

For obvious reasons, plaintiffs in retaliation actions are seldom able to muster direct proof of a causal link between an employer's actions and their earlier protected activity. Despite

its name, proof of discrimination under the direct method is therefore "not limited to near-admissions by the employer that its decisions were based on a proscribed criterion." *Hasan v. Foley & Lardner LLP,* 552 F.3d 520, 527 (7th Cir. 2008) (quoting *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006)). Rather, an employee may meet her burden with circumstantial evidence "which suggests discrimination albeit through a longer chain of inferences." *Id.* The Seventh Circuit has recognized that such circumstantial evidence may fall into three categories, the first of which includes "suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which an inference of [retaliatory] intent might be drawn." *Coleman v. Donahoe,* 667 F.3d 835, 859 (7th Cir. 2012) (citing *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 740 (7th Cir. 2011)); *Venturelli v. ARC Community Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).[15]

The only circumstantial evidence to which Plaintiff points is the "suspicious timing" of her disciplinary write-ups and subsequent termination. As Plaintiff puts it:

> Defendant[s] engaged in a pattern of issuing Cain discipline after Cain had complained to Bonham and Gregory in April of 2012. Within a matter of weeks, Cain was issued discipline for 'poor work ethic' this, after many years of good job performance. Thereafter, Cain was laid-off on the heels after [sic] filing her charge of discrimination on August 30, 2012. Cain was then not returned to work, as in previous years, after filing her EEOC charge in October of 2012.

Pl.'s Resp. 16. Plaintiff exaggerates the tightness of the temporal link between the two sets of events she describes. She alleges that she complained to Bonham and Gregory about sexual

---

[15] The other two categories of persuasive circumstantial evidence are (1) "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently," and (2) "evidence that the employer offered a pretextual reason for an adverse employment action." *Coleman,* 667 F.3d at 859 (additional citations omitted). As we note below, Plaintiff offers two pieces of evidence consistent with a pretext theory, though she fails to build these stray references into an argument.

harassment in April of 2012, but her disciplinary write-ups occurred in July—a "matter of weeks" only if weeks are counted on toes as well as fingers. Similarly, Plaintiff filed her EEOC charge on August 30, 2012, but was not terminated until October 22; the termination was thus "on the heels" of the EEOC complaint only according to a fairly liberal reading of the term.

"We have often invoked the general rule that 'temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter.'" *Coleman,* 667 F.3d at 860 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)) (additional citations omitted). When there is additional "corroborating evidence" of a retaliatory motive in addition to timing, then an interval of as much as "a few weeks or even months" may be probative evidence of a causal nexus. *Id.* at 861. Suspicious timing alone, however, is "rarely sufficient"—and this is especially so where the events are separated by a matter of months. In *Tomanovich v. City of Indianapolis,* 457 F.3d 656 (7th Cir. 2006), for instance, the Seventh Circuit concluded that, for plaintiff who had been terminated four months after firing an EEOC charge and two months after filing a civil suit, pointing to the timing alone could not carry his burden. 457 F.3d at 665. Other courts within this circuit have reached similar conclusions, even when presented with considerably narrower time gaps. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (holding that a three-month gap alone could not reasonably support a causal connection); *Hamilton v. Republic Airways Holdings,* 2014 WL 2968596, at *10 (S.D. Ind. July 2, 2014) (granting summary judgment on a retaliation claim based only on the fact of termination *three days* after protected activity); *Keough v. Eli Lilly & Co.*, 2013 WL 4787224, at *11 (S.D. Ind. Sept. 6, 2013) (granting summary judgment on a retaliation claim relying on a two-month gap as "suspicious timing").

25

Although Plaintiff does not expressly present a pretext argument, she does make two allegations—in the midst of her discussion of suspicious timing—that appear to be aimed at undercutting Defendants' ostensible reasons for disciplining her in July 2012. *See Dickerson v. Bd. of Trustees of Community College Dist. No. 522,* 657 F.3d 595, 601 (7th Cir. 2011) (discussing pretext evidence as a form of circumstantial proof under the direct method). First, one of the two co-workers who submitted the complaints that led to her first disciplinary write-up was Kevin Rabenstein (he of the alleged sexual harassment); moreover, his complaint letter "for some inexplicable reason appears on PRC letterhead." Pl.'s Resp. 17 (citing Gregory Dep. 37). Second, she asserts that the latter of her two formal disciplinary notices was dated and signed before HR director Sara Beach had completed her investigation into the matter. *Id.* (citing Gregory Dep. 41).

We do not believe that this is sufficient evidence to give rise to an inference that the city's stated reasons for disciplining Plaintiff were pretextual. Two PCR employees filed complaints about Plaintiff's behavior, and she does not dispute that these complaints arose from real confrontations she had had with her co-workers. *See* Cain Dep. 125–130, 136 (describing the interaction with her co-worker Ms. Crabtree that led to the first written warning). Gregory expressly denies furnishing Rabenstein PCR letterhead or otherwise exerting any influence over him in submitting his complaint about Plaintiff, Gregory Dep. 37; to infer collusion from the letterhead, and nothing more, would require naked speculation. HR director Sara Beach made written notes of the disciplinary meeting she and Gregory had with Plaintiff to discuss these two co-worker complaints in conjunction with Plaintiff's first "written warning." These notes reflect that, even as of the first disciplinary meeting, the department's problems with Plaintiff's behavior were nothing new: "Dorothy [Cain] has previously been given 2 verbal warnings in

relation to her conduct and attitude toward fellow coworkers . . . I advised her that this was not the first incident involving coworkers complaining about her treatment of them. I advised her that we were issuing a written warning about her conduct in hopes that she will understand how serious we take this." Defs.' Ex. A-11. Thus, even if we assume Rabenstein had ulterior motives in complaining about Plaintiff to his supervisors, he was not the first or the only co-worker to make a similar complaint, and Plaintiff has given us no reason to think that the misconduct described in those co-worker complaints did not occur.

Plaintiff was issued a second written warning later in July after another co-worker, Steven Chrisp, complained that she had told him how to do his job. Gregory testified that he issued this second written notice to Plaintiff on July 16, 2012, though the face-to-face meeting with her—which both he and HR director Beach attended—did not occur until August 1.[16] Plaintiff's representations notwithstanding, Gregory did not testify that he disciplined Plaintiff before Beach's investigation was complete. Rather, he acknowledged that he issued the "written warning" before the meeting, and he did not recall whether he had spoken to Beach about the matter before the meeting occurred. *See* Gregory Dep. 40–44. For her part, Plaintiff disputes specifics of the account presented by her co-worker Steven Chrisp, but not that the incident in question occurred. *See* Cain Dep. 118–119. Beach prepared written statements at the time in connection with both her investigation of Chrisp's complaint and the August 1 meeting with Plaintiff; her account reflects that while Plaintiff heatedly resented being criticized, she also acknowledged that she had, indeed, been "instructing" co-workers on how to do their jobs

---

[16] In his deposition, Gregory vacillated on the subject of whether he had talked to Cain before issuing her a disciplinary notice. At one point he said he "probably" had, Gregory Dep. 42, while later he stated that "I would say no because – I don't know." *Id.* at 44. He denied that he had issued her the disciplinary notice based solely on Mr. Chrisp's complaint, noting that "Sara [Beach] came out and talked to Chrisp." *Id.* Her own records indicate that she had that conversation on July 20, 2012. Defs.' Ex A-12.

despite having been warned not to do so by her previous disciplinary notice. *See* Defs.' Exs. A-12, A-13. Without knowing anything about the parks department's protocol for handling these matters, we cannot say that this sequence of events—which is not obviously improper—is evidence of bad faith by Gregory. The department issued Plaintiff two "written warnings," unaccompanied by any further discipline, in July 2012 based on her admitted run-ins with co-workers; the portions of Gregory's deposition she cites are insufficient to raise a reasonable inference of pretext.

Even if no individual piece of evidence or circumstantial theory persuasively establishes a causal connection between protected activity and adverse action, a plaintiff proceeding under the direct method of proof may still prevail if she can piece together a "convincing mosaic" from disparate sources. *Coleman,* 667 F.3d at 862; *Cole v. Illinois,* 562 F.3d 812, 815 n.2 (7th Cir. 2009). Plaintiff falls short here. The "suspicious timing" on which she relies is not, in light of Seventh Circuit precedent, particularly suspicious, and her underdeveloped pretext argument adds little to no power to the picture she seeks to paint. *Cf. Coleman,* 667 F.3d at 860 (reversing grant of summary judgment where plaintiff "has offered evidence of suspicious timing and pretext, and that evidence is sufficient to present a genuine issue of fact"). In fact, the opposite is true: where numerous incidents bring Plaintiff's "professionalism and ability . . . into question," they undermine any inference of suspicious timing. *See Moser,* 406 F.3d at 905. As we often say, a federal court is not a "super-personnel department" empowered to second-guess an employer's decision to discipline or terminate an employee. *Coleman,* 667 F.3d at 662; *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006). Only where evidence would permit a reasonable fact-finder to conclude that Plaintiff was subjected to adverse action because of her statutorily-protected activity do we lift the lid on an employer's decision-making process. Plaintiff may

have valid reasons to object to the city's handling of her employment, ranging from the boorish

behavior of her male co-workers to a personality clash with her supervisor Ivan Gregory

stemming from his refusal to allow her to offer guidance to co-workers in the way that she

wished. She has not made a case, however, that these two sources of grievance are causally

linked, and thus her retaliation claim must fail.

### Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

Judgment shall enter in favor of Defendants.

IT IS SO ORDERED.

Date: _____05/04/2015_____

_SARAH EVANS BARKER, JUDGE_
United States District Court
Southern District of Indiana

Distribution:

Matthew L. Hinkle
COOTS HENKE & WHEELER
mhinkle@chwlaw.com

Brandi A. Gibson
COOTS HENKE & WHEELER, P.C.
bgibson@chwlaw.com

John Robert Panico
PANICO LAW LLC
jpanico@discriminationlawgroup.com